FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
----------------------------------------------------------X

In Re:                                                                  Chapter 11

PRINCETON OFFICE PARK, L.P.,                         Case No.: 08-27149 (MBK)


                                   Debtor.
----------------------------------------------------------X

APPEARANCES:

Morris S. Bauer, Esq.
Norris, McLaughlin & Marcus, P.A.
721 Route 202-206
P.O. Box 5933
Bridgewater, New Jersey 08807
Attorney for the Debtor, Princeton Office Park, L.P.

Stephen B. McNally, Esq.
McNally & Associates, LLC
93 Main Street, Suite 201
Newton, New Jersey 07860
Attorney for the Creditor, Plymouth Park Tax Services LLC


**MICHAEL B. KAPLAN, U.S.B.J.**


**OPINION**

**I.     INTRODUCTION**

        This matter comes before the Court on the motion filed by the Debtor, Princeton Office Park, L.P., seeking an order fixing the claim amount, interest rate, and payment terms for the proof of claim filed by Plymouth Park Tax Services, LLC ("Plymouth Park") in contemplation of confirmation of the Debtor's Plan of Reorganization (the "Plan"). The principal issues before the Court are two-fold: (1) whether the holder of a tax sale certificate maintains a "tax claim"

1

under 11 U.S.C. § 511(a),[1] thereby necessitating the payment of the New Jersey statutory interest rate as part of the Debtor's treatment under its Plan pursuant to 11 U.S.C. § 1129(b)(2)(A); and (2), if the claim does not qualify as a "tax claim," what is the appropriate interest rate to be applied to the claim.

For the reasons set forth below, the Court finds that, in New Jersey, a tax sale certificate holder is not the holder of a "tax claim" within the meaning of § 511(a). Rather, the tax sale certificate holder acquires only a lien on the property owner's real estate, which may be redeemed by payment of the statutory redemption amount. Accordingly, the interest rate to be applied to the tax sale certificate will be calculated in accordance with the Supreme Court's decision Till v. SCS Credit Corp., 541 U.S. 465 (2004).

## II.    PROCEDURAL HISTORY AND FACTS

Debtor is a real estate development company, which owns real property located at 4100 Quakerbridge Road, Lawrence Township, New Jersey (the "Property"). On December 19, 2005, the Tax Collector of the Township of Lawrenceville (the "Township") conducted a sale of municipal tax liens in order to collect unpaid taxes of $204,396.79. At the sale, Plymouth Park was the successful bidder, satisfying the amount of the unpaid taxes, agreeing to accept a zero percent interest rate on the certificate, and paying the Township a premium of $600,100.[2]

---

[1] Absent contrary indication, all "Code," chapter, and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 as amended by the Bankruptcy Abuse Prevention and Consumer Prevention Act of 2005 ("BAPCPA"), Pub. L. 109–08, 119 Stat. 23. "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "FRCP" and "FRE" references are to the Federal Rules of Civil Procedure and the Federal Rules of Evidence, respectively.

[2] At an auction of a tax sale certificate, the bidders bid against each other on the amount of interest which will be generated by the certificate, with the winning bid being the lowest interest rate the bidder will accept. N.J.S.A. 54:5-32. If the interest rate is bid down to 0%, bidders bid the amount of money or "premiums" they are willing to pay in excess of the unpaid taxes. Id. The premiums are returned to the lien purchaser if the lien is redeemed within five years, after which time the premium is turned over to the municipality. N.J.S.A. 54:5-33. The premiums are not part of the amount needed to redeem the tax sale certificate and the property owner has no responsibility for reimbursing the lien holder for the premium. See Michael G. Pellegrino & Ralph P. Allocca, Tax Certificates, A Review of Tax Sale Law, 26 Seton Hall L. Rev. 1607, 1610 (1996).

Subsequent to the tax sale, Plymouth Park paid the taxes accruing on the Property for 2006, 2007, and the first two quarters of 2008. Pursuant to N.J.S.A. 54:4-67, the amount Plymouth Park paid for the unpaid taxes accrued interest at a rate of 18%, as fixed by the Township.

On September 9, 2008, Debtor filed a petition under Chapter 11 of Title 11 of the United States Code. In October 2008, Plymouth Park filed a proof of claim in the amount of $1,775,791.33, citing "taxes" as the basis of the debt obligation, which sum included fees, the amount paid for the tax sale certificate, accrued post-petition interest at a rate of 18%, subsequent taxes paid to the municipality, penalties, and the $600,100 premium paid by Plymouth Park as part of the debt obligation. On June 10, 2009, Debtor filed a Plan and Disclosure Statement, which provided for extended satisfaction of Plymouth Park's claim, but lowered the interest rate to 6% to reflect the market interest rate at the time.[3] The Plan also proposed that Debtor would execute a note and mortgage to secure its obligation to Plymouth Park.

On July 13, 2009, Plymouth Park filed an objection to the Disclosure Statement, arguing that the Debtor was barred from adjusting the interest rate on the tax sale certificates and from substituting a note and mortgage for its tax sale position. The Court held a hearing on the Disclosure Statement on July 30, 2009, at which time it directed the Debtor to file a motion to address the issues raised in Plymouth Park's objection. In accordance with that ruling, on

---

[3] The Disclosure Statement accompanying the Plan states:

> The Class Two Claim consists of the Secured Claim of Plymouth Park. The Class Two Creditor will have a first lien upon and security interest in the Property to the extent of this Class' Allowed Claim. The Debtor will execute a standard Note and Mortgage in favor of Plymouth Park, which provides for (i) interest at the Interest Rate from and after the Effective Date; (ii) quarterly principal and interest payments starting on the first day of the third month succeeding the Effective Date with a balloon on the last (20th) payment, and (iii) amortization over 25 years. USLR will execute a guarantee relating to this Note. This Class is impaired.

"Interest Rate" is defined in Article I, Section 1.2.17 of the Plan as "6% or such other rate as determined by the Court."

3

August 18, 2009, Debtor filed a motion for entry of an order fixing the claim amount, interest rate and payment terms for Plymouth Park's claim, which the Court treated as a motion for partial summary judgment. After a hearing on the motion on December 21, 2009, the Court reserved decision.

Meanwhile, on July 15, 2009, the Court entered an order modifying Plymouth Park's proof of claim to remove the $600,100 premium paid by Plymouth Park to the Township.[4] Pursuant to that order, Plymouth Park filed an amended proof of claim on January 28, 2010, adjusting the amount due to $1,155,487.81 as of the September 9, 2008 filing date.

## III.  JURISDICTION

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(b) and the Standing Order of the United States District Court dated July 10, 1984, referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (K) and (L). Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## IV.  DISCUSSION

### A.  Standard of Review

A court may grant summary judgment when there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Proc. 56(c). To prevail on a motion for summary judgment, the moving party must demonstrate that, based on the evidence presented, a reasonable trier of fact could not rationally find in favor of the non-moving party. Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007). Once the moving party has met its burden, summary judgment should be granted if the non-moving party fails to create an actual showing "sufficient to establish an element essential to that party's case,

---

[4] On September 8, 2009, Debtor filed a modified Plan and Disclosure Statement.

4

and on which the party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In the case at bar, the parties have consented to the Court's determination as to the applicability of 11 U.S.C. § 511 by means of summary judgment, expressly acknowledging that there are no genuine issues of material fact and that the matter is ripe for resolution as a matter of law.

### B. New Jersey Law

In its motion for partial summary judgment, Debtor argues that Plymouth Park's claim is not a "tax claim" under New Jersey law, and therefore is not entitled to the anti-modification protections of § 511(a). This Section, enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, limits a debtor's ability to modify the interest rate on a tax claim in its plan:

> If any provision of this title requires the payment of interest on a *tax claim* or on an administrative expense tax, or the payment of interest to enable a creditor to receive the present value of the allowed amount of a tax claim, the rate of interest shall be the rate determined under applicable nonbankruptcy law.

11. U.S.C. § 511(a) (emphasis added). Thus, the paramount issue is whether Plymouth Park, as a tax sale certificate claimant, is a holder of a tax claim for purposes of § 511(a).

Inasmuch as the term "tax claim" is not defined in the Code, and "[p]roperty interests are created and defined by state law," this Court must look to New Jersey law to determine whether Plymouth Park's purchase of tax sale certificates qualifies as a "tax claim" under the Code. Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 20 (2000) ("The 'basic federal rule' in bankruptcy is that state law governs the substance of claims, . . . Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law[.]'") (citations omitted); Butner v. U.S., 440 U.S. 48, 55 (1979) (stating that, unless some federal intent requires a different result, property interests are created and defined by state law); O'Dowd v. Trueger (In

5

re O'Dowd), 233 F.3d 197, 202 (3d Cir. 2000) ("While federal law defines what types of property comprise the estate, state law generally determines what interest, if any, a debtor has in property.").

"The sale of tax liens is a municipal financing option that provides a mechanism to transform a non-performing asset into cash without raising taxes." Varsolona v. Breen Capital Servs. Corp., 180 N.J. 605, 609 (N.J. 2004) (citing Georgette C. Poindexter, Lizabethann Rogovoy & Susan Wachter, Selling Municipal Tax Receivables: Economics, Privatization, and Public Policy in an Era of Urban Distress, 30 Conn. L. Rev. 157, 158 (1997)). To provide municipalities with the power to collect unpaid taxes, the New Jersey Legislature enacted the Tax Sale Law, N.J.S.A. 54:5-1 *et seq.*, which, among various other aspects, provides for the sale of tax sale certificates. "When municipal taxes are delinquent for the period stated by statute, a lien arises on the land on which the taxes are assessed, N.J.S.A. 54:5-6, and the municipality may enforce the lien by selling the property as prescribed by statute. N.J.S.A. 54:5-19." Savage v. Weissman, 355 N.J. Super. 429, 436 (N.J. App. Div. 2002). "Under this mechanism, a municipality receives the tax monies from third parties," I.E.'s, L.L.C. v. Simmons, 392 N.J. Super. 520, 523-24 (N.J. Law Div. 2006); and "[t]he purchaser acquires the lien, with the title, N.J.S.A. 54:5-42, and receives a certificate of sale, the [tax sale certificate]. N.J.S.A. 54:5-46." Varsolona, 180 N.J. at 618; N.J.S.A. 54:5-31.

The Tax Sale Law provides that the property is "sold" at the tax sale and thereafter conveyed to the successful bidder by delivery of the tax sale certificate. N.J.S.A. 54:5-46; 54:5-47. However, "[a] tax sale certificate is not an outright conveyance. It creates only a lien on the premises and conveys the lien interest of the taxing authority." Savage, 355 N.J. Super. at 436 (citing Chelsea Laundry Co. v. Toscano, 14 N.J. Super. 496, 500 (N.J. Ch. Div. 1951)). Thus, at

6

conclusion of the sale, the purchaser is vested with an "inchoate right or interest" and has "the right to foreclose the equity of redemption pursuant to the statutory scheme." Varsolona, 180 N.J. at 618 (citing Gasorek v. Gruber, 126 N.J. Super 511, 515 (N.J. App. Div. 1974)).

> The inchoate interest consists of three rights: the right to receive the *sum paid for the certificate with interest at the redemption rate for which the property was sold*; the right to redeem from the holder a subsequently issued tax sale certificate; and the right to acquire title by foreclosing the equity of redemption of all outstanding interests, including that of the property owner.

Id. (citing Jefferson Twp. V. Block 447A, Lot 10, 228 N.J. Super. 1, 4-5 (N.J. App. Div. 1988) (emphasis added).

### C. New Jersey Tax Sale Law and § 511

Allowing that a holder of a tax sale certificate possesses a lien interest in property under New Jersey law, the issue is whether such a "lien" constitutes a "tax claim" under § 511(a). A "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured . . . ." 11 U.S.C. § 101(5). "Congress intended by this language to adopt the broadest available definition of 'claim.'" Johnson v. Home State Bank, 501 U.S. 78, 83 (1991). A "lien," however, is defined as a "charge against or interest in property to secure payment of a debt or performance of an obligation." 11 U.S.C. § 101(37). Since the holder of a lien retains a "right to payment," the Supreme Court has concluded that liens constitute claims under the Code. Johnson, 501 U.S. at 84-85.

In this regard, the Court agrees with Plymouth Park that the term "tax claim" must include a "tax lien." This begs the question, however, as to whether the "lien" that Plymouth Park acquired as a result of its purchase of the tax sale certificate qualifies as a "tax lien." Stated differently, because the taxes have already been paid to the Township, is the lien that Plymouth

7

Park holds a "tax lien," and therefore a "tax claim" under the Code, or is it simply another statutory lien that would fall outside the scope of § 511(a).

All statutory analysis must begin with the language of the particular statute *sub judice*. Dobrek v. Phelan, 419 F.3d 259, 264 (3d Cir. 2005). Having observed, however, that § 511 offers no definition of either "tax claim" or "tax lien," the Court turns its attention to other sections of the Bankruptcy Code. It is well-settled that in interpreting a statute, a court should look beyond the particular clause at issue, but rather to the statute as a whole in order to give effect to all of its component parts. Stafford v. Briggs, 444 U.S. 527, 535 (1980) (quoting Brown v. Duchesne, 19 How. 183, 194 (1857)). In this regard, 11 U.S.C. § 724(b) provides useful direction. In fixing a distribution scheme for certain liens, including tax liens, § 724(b) offers the following description of a tax lien:

> Property in which the estate has an interest and that is subject to a lien that is not avoidable under this title . . . and that secures an allowed claim for a tax . . . .

It is palpably clear from the foregoing description that in order for a creditor to hold a "tax lien," the holder must first possess an allowed claim for "a tax." In the case at bar, Plymouth Park does not possess an allowed claim for taxes,[5] as it is undisputed that the underlying taxes owing to the Township have been paid and that Plymouth Park is not empowered to assess or collect taxes. What Plymouth Park does hold is a statutory lien[6] which may be satisfied by payment of the sum paid for the tax sale certificate with a redemption rate of interest fixed by statute.

---

[5] Needless to say, the Court looks beyond the mere citation to "taxes" by Plymouth Park in its Proof of Claim.

[6] 11 U.S.C. § 101(53) defines "statutory lien" as:

> [L]ien arising solely by force of a statute on specified circumstances or conditions, or lien of distress for rent, whether or not statutory, but does not include security interest or judicial lien, whether or not such interest or lien is provided by or is dependent on a statute and whether or not such interest or lien is made fully effective by statute.

8

**D. Other Courts and § 511(a)**

As this is an issue of first impression in this Circuit, the Court seeks guidance from the few courts that have addressed the rights of a purchaser of tax sale certificates after the enactment of § 511. In 2006, the Bankruptcy Court for the Northern District of Texas decided In re Davis, which addressed whether a claim owed to a private entity, pursuant to a prepetition contractual agreement whereby the entity paid off the taxes on behalf of the debtor, constituted a tax claim for purposes of § 511(a). 352 B.R. 651, 654 (Bankr. N.D. Tex. 2006). In Davis, a private entity paid off the taxes owed on a debtor's home pursuant to § 32.06 of the Texas Tax Code. Id. at 652. Under Texas law, "a party who . . . pays the real property taxes of another and receives transfer of the tax lien on the property is an assignee who is subrogated to all the rights of the transferring taxing unit." Id. at 655 n.8. The Court found that those rights included those provided in § 511. Id. at 655.

In adjudging the entity's claim a "tax claim" subject to § 511(a), the Davis Court first noted that "[t]he language of section 511 indicates Congressional intent to include claims held by private parties within its scope[,]" using the term "creditors" rather than limiting § 511(a) to governmental entities. Id. at 654. With that understanding, the Court focused "on the nature of the underlying debt," rather than the identity of the holder of the claim, concluding that, under Texas law, "assignees and subrogees have the same rights to which their predecessors-in-interest would be entitled had no transfer taken place." Id. at 655. Thus, as the successor-in-interest to the taxing authority under the Texas statute, the entity was entitled to the protection of § 511(a). Id.

In July 2008, the Bankruptcy Court for the Southern District of Texas took a markedly different approach in deciding In re Sheffield, 390 B.R. 302 (Bankr. S.D. Tex. 2008). In

9

Sheffield, the debtors executed a promissory note and tax lien deed of trust in favor of a company in exchange for that company paying off the debtors' tax obligations. Id. at 303-04. After the company paid the tax obligations, the taxing authorities transferred their liens to the company pursuant to § 32.06 of the Texas Tax Code. Id. at 304. In their plan, the debtors sought to reduce the interest rate on the note; however, relying on In re Davis, the company objected, arguing that the debtors were prohibited from modifying the interest rate on the note as it held a tax claim under § 511. Id. Conversely, the debtors argued that the company held only a tax lien, not a tax claim, and therefore § 511 was inapplicable. Id. at 305.

The Sheffield Court agreed with the debtors and found In re Davis inapposite. Id. As opposed to Davis, the Court ruled that the company held only a tax lien, as the company's satisfaction of the tax claim "extinguished the tax claim." Id. at 306. It then discussed the distinctions between claims and liens under the Code, noting that Congress specifically limited the applicability of § 511 to tax claims only. Id. As to the difference, the Court pointed out that, while liens on real property pass through bankruptcy unaffected, claims are ordinarily discharged. Id. Accordingly, the Court "examine[d] the underlying nature of [the] debt" and held § 511(a) inapplicable because the company did not hold a tax claim. Id. The Court reasoned that, because the company had already "*paid* the claim," it "did not purchase the taxing unit's claim." Id. (emphasis in original). Instead, rather than owing real estate taxes, the underlying debt on which the debtors were obligated was the promissory note. Id.

In August 2008, the Bankruptcy Court for the Southern District of Texas also decided In re Prevo, 393 B.R. 464 (Bankr. S.D. Tex. 2008). Nearly factually indistinguishable from Sheffield, in Prevo, a third party paid the taxes on the debtor's property in exchange for an assignment of the taxing authorities' tax liens under § 32.06 of the Texas Tax Code, and the

10

debtor executing a promissory note in its favor.  Id. at 467.  Following the reasoning of Sheffield, the Court found that § 511(a)'s "anti-modification protection applies solely to tax claims, not to tax liens."  Id. at 472.  In concluding as such, the Court focused on Texas law, which unlike other states, "does not allow third parties to purchase tax claims."  Id. at 471.  Like Sheffield, it emphasized that "Texas law provides that upon full payment of the taxes, the tax lien will be transferred.  Tex. Tax Code Ann. § 32.06(b)."  Id.

Looking to the plain meaning of § 511(a), the Prevo Court refused to "read 'tax claims' broadly to encompass lenders who are expressly given a 'tax lien.'"  Id. at 472.  As such, it disagreed with the Davis Court in holding that "Texas Tax Code §§ 32.06 and 32.065 allow a third-party creditor to acquire a transferred tax lien, but not a tax claim."  Id. at 474.  "Although a third-party creditor is subrogated to the rights of the taxing authority with respect to the tax lien and has its claim secured by the tax lien," the Court found the subrogation "limited to the taxing authority's rights regarding foreclosure or judicial sale."  Id. at 473.  It then concurred with Sheffield that "a third party who pays the property taxes of another acquires a transferred *tax lien*, not a *tax claim*, because the underlying tax claim no longer exists."  Id.  Since the third-party in issue held a tax lien, the Court found it was not entitled to the anti-modification protection of § 511(a).  Id. at 474.

In February 2009, the Bankruptcy Court for the Southern District of Ohio, applying Ohio law, ruled that a creditor held "a 'tax claim' within the meaning of § 511(a) and not merely a lien against the property."  In re Cortner, 400 B.R. 608, 612 (Bankr. S.D. Ohio 2009).  Significantly, the Ohio statute at issue differs from the Texas law previously cited.

> [U]nder Ohio law, the holder of tax certificates does not pay a county treasurer for the taxes and in turn hold a completely new debt with a lien against the real estate. Rather, under Ohio law, from the language chosen by the Ohio legislature in creating the procedures for the sale of tax certificates, the delinquent taxes are

11

>transferred and, therefore, the [c]reditor's claim is a tax claim. The last sentence of [the Ohio Revised Code] § 5721.32(E) refers to both a transfer of the taxes and the "superior lien of the state" to the certificate holder.

Id. at 612-13. Therefore, the Court found that, not only was the creditor transferred a lien on the property, but also a claim for delinquent taxes. Id. at 613. It further observed that, unlike other states, purchasers of tax certificates in Ohio are treated similarly to the original taxing authorities, in that they receive a super-priority lien on the property, among various other treatment. Id. at 613-14.

Adopting the approaches taken in Davis and Cortner, in September 2009, the District Court for the Southern District of Texas held that the Bankruptcy Court had erred in confirming a plan under Chapter 13 when the debtor lowered the interest rate on tax claims held by a private party. In re Kizzee-Jordan, 2009 U.S. Dist. LEXIS 89747 (S.D. Tex. Sept. 28, 2009). In Kizzee-Jordan, the debtor had entered into an agreement with a private party to pay his delinquent property taxes in return for his "promise to repay it and to agree to its having the tax lien on his land" pursuant to § 32.065(c) of the Texas Tax Code. Id. at *1. In 2008, the debtor petitioned for relief under Chapter 13 of the Code. Id. In his plan, he lowered the party's interest rate from the contractually agreed to 18% to 8.5%. Id. The party objected, arguing that its rate was protected by § 511(a). Id. at *1-2. The Bankruptcy Court overruled the objection and confirmed the plan. Id. at *2.

In pronouncing the debt owed to the party a "tax claim," the District Court in Kizzee-Jordan ruled that, "[i]n bankruptcy law, a tax claim is a debt *originally* owed directly to a governmental unit for unpaid ad-valorem property taxes." Id. at *2-3 (emphasis added). Inasmuch as the origin of the debt was the debtor's "failure to meet his responsibility to local governments arising from his ownership of land[,]" the Court found the debt to be a "tax claim"

12

within the meaning of § 511(a). Id. at *3. Moreover, it explained that, under Texas law, private parties purchasing tax lien certificates are statutorily "subrogated to the rights of the taxing unit." Id. at *4. As such, the Court concluded that the party "took the government's secured and protected place" and therefore was entitled to be sheltered by § 511(a). Id.

### E. Analysis

As noted above, the parameters of the property interest held by holders of tax lien certificates, as well as the scope of the rights afforded thereunder, are determined by state law. Butner, 440 U.S. at 55. Accordingly, the decisions cited previously, bottomed on the laws of Texas and Ohio, while instructive, are not dispositive for the case at bar. Although the Court agrees with the ultimate holdings in Sheffield and Prevo, it does so based on different reasoning. Simply put, the Texas and Ohio statutes referenced in these cases are inherently dissimilar from the New Jersey statute which governs the Court's ruling. New Jersey's Tax Sale Law lacks language comparable to § 32.06 of the Texas Tax Code, providing that purchasers of tax lien certificates are assignees or subrogees of the taxing authority. See In re Kizzie-Jordan, 2009 U.S. Dist. LEXIS 89747, at *4. Unlike Ohio law, the New Jersey Tax Sale Law equally fails to designate purchasers of the certificates as transferees of the tax claims. See In re Cortner, 400 B.R. 612-13. Conversely, in New Jersey, the Tax Sale law has been interpreted as simply conveying to the purchaser of a tax sale certificate a "lien" on the underlying property. Savage, 355 N.J. Super. at 436. There is no transfer of a tax claim, as the taxes are paid in full at the conclusion of the tax sale. See N.J.S.A. 54:5-31; I.E., LLC, 392 N.J. Super. at 528 ("In exchange for the tax sale certificate, the municipality receives the amount of taxes owed plus interest and costs of the sale."); contra In re Cortner, 400 B.R. 612-13. Thus, all that remains is a

13

lien against the Property that can be redeemed by the Debtor remitting to Plymouth Park the amount Plymouth Park had paid to the Township for the Debtor's unpaid taxes, plus interest.

This determination is further buttressed by the fact that Plymouth Park's rights as the holder of the tax sale certificate differ significantly from those of a municipality holding a tax claim. Unarguably, the certificate-holder's rights are far more restricted than those of the municipality. For example, whereas the municipality's future claims for unpaid taxes constitute "a continuous lien on the land," N.J.S.A. 54:5-6, the certificate-holder's lien is subject to subsequent liens by the municipality. See Jefferson Twp., 228 N.J. Super. at 5 ("Foreclosure by a municipality under the [In Rem Tax Foreclosure Act, N.J.S.A. 54:5-104.29 to -104.75] extinguishes all the prior holder's rights, including the right to receive, upon redemption, the amount originally paid by the holder for the tax certificate."). Moreover, unlike the municipality, the holder's lien is subject to subsequent tax sale certificates. Lato v. Rockaway Twp., 16 N.J. Tax 355, 363 (N.J. Tax Ct. 1997) ("A subsequent tax sale certificate also has priority over an earlier certificate . . . and the foreclosure of the later certificate can extinguish the earlier certificate.") (internal citation omitted).

In addition, a certificate-holder's tax sale certificate must be recorded in the county records to constitute a valid lien on the property. N.J.S.A. 54:5-51 ("When the certificate of sale is not made to the municipality, it shall, unless so recorded within three months of the date of sale, be void as against a bona fide purchaser, lessee or mortgagee whose deed, lease or mortgage is recorded before the recording of the certificate."). As such, it is clear that the rights of a holder of a tax sale certificate differ substantially from those of the municipality holding the original tax claim.

As further support, to redeem the property from the lien holder, the statute does not instruct the property owner to remit to the holder amounts due for "unpaid taxes." Rather than characterizing the amount the property owner is required to pay as "unpaid taxes," the statute mandates that the obligor remit the redemption amount, which is described as "the sum paid at the sale, with interest at the rate of redemption for which the property was sold." N.J.S.A. 54:5-58. This evidences in the matter *sub judice* that the Debtor is not paying taxes, but instead is paying a sum representing the amount Plymouth Park paid the Township for the Debtor's unpaid taxes, plus interest and various fees.

The Court agrees with Plymouth Park that, had its claim been a "tax lien," it would undoubtedly hold a "tax claim" under § 511(a).[7] However, looking beyond the holder of the claim, it is clear that the origin of the claim arose from Plymouth Park's satisfaction of the Debtor's outstanding tax obligation to the Township, in full.[8] Thus, Plymouth Park's claim against the Debtor has never been for taxes; rather, it is for the redemption price owed as a result of Plymouth Park having paid the Debtor's tax obligation to the Township.[9] Had the Township

---

[7] In this regard, the Court disagrees with Sheffield and Prevo insofar as they distinguish between "tax liens" and "tax claims." Rather, the Court accepts as controlling the Supreme Court's finding in Johnson that, for all essential purposes, a "lien" is a type of "claim" under the Code because the lien holder has a right to payment. Johnson, 501 U.S. at 84-85.

[8] The Court also takes issue, respectfully, with the District Court's statement in Kizzee-Jordan that "a tax claim is a debt *originally* owed directly to a governmental unit for unpaid ad-valorem property taxes." Kizzee-Jordan, 2009 U.S. Dist. LEXIS 89747, at *2 (emphasis added). Nowhere in § 511(a) does the word "originally" appear. Taking this approach to its logical extreme, a mortgagee which advances payment for delinquent real estate taxes pursuant to its mortgage instruments may thereafter seek payment at the higher statutory rate of interest for having a "tax claim."

[9] Essentially, the rights of a purchaser of a tax sale certificate are akin to that of a mortgagee.

> Like the mortgagee, the holder advances money, in at least the amount of the outstanding municipal lien, N.J.S.A. 54:5-31, and in return receives a lien on the assessed property, which passes from the municipality to the holder. N.J.S.A. 54:5-42. A mortgagee and a tax sale purchaser have the right to foreclosure if, in the case of a mortgage, the debt which the mortgage secures is not paid, or, in the case of a certificate holder, the property is not redeemed.

assigned or subrogated its rights to Plymouth Park, the Court would follow the approaches taken in the Texas and Ohio cases. Absent such proof of assignment or subrogation, the Court is constrained to find that, in New Jersey, the purchaser of a tax sale certificate acquires a statutory lien claim, not a tax claim, and is therefore not entitled to the protection of § 511(a).

### F. Till

Having ruled that Plymouth Park is not entitled to the statutory interest rate under § 511(a), the Court must now determine the appropriate interest rate to be charged on Plymouth Park's lien.[10] In 2004, the Supreme Court decided Till v. SCS Credit Corp., which effectively overruled the Third Circuit's prior decision in Rankin v. DeSarno, 89 F.3d 1123 (3d Cir. 1996), cert. denied, 519 U.S. 1108 (1997). In re Flores, 2006 Bankr. LEXIS 4094, 2006 WL 4452973 (Bankr. D.N.J. March 29, 2006). In Rankin, various claimants objected to confirmation of a debtor's Chapter 13 plan which sought to reduce the interest rate to be paid on prepetition tax claims. While the claimants sought to utilize the municipal interest rates to calculate present value on the claims, the debtor proposed a "reasonable" rate. Analyzing § 1325(a)(5)(B)(ii), the Court explained that "[p]resent value is a market rate concept, determined by the use of an interest rate which fairly compensates the creditor for not receiving the full amount of its secured claim upon confirmation of the debtor's plan." Rankin, 89 F.3d at 1128. Since it found that a creditor delaying payment was essentially extending a loan to the debtor, id. at 1129 n.4, the

---

Jefferson Twp., 228 N.J. Super. at 5-6. Thus, rather than being subrogated to the rights of the municipality, the holder of a tax claim merely holds a lien against real property which can be foreclosed if the property is not timely redeemed.

[10] Although invited by the Debtor to address the punitive nature of the statutory 18% interest rate charged by municipalities on delinquent taxes, the Court will decline to do so, cognizant that the fixing of the statutory rate falls within the province of the Legislature. However, the Court would be remiss if it neglected to take the opportunity to implore the Legislature to revisit the propriety of imposing an interest rate originally fixed in an era (late 1970's) of daily increasing prime rates and double-digit mortgage rates. It is irresponsible, especially in this economic environment, to impose the present statutory rate where the underlying obligation is fully secured by a first lien on real estate. Equally troubling are the municipalities' knee-jerk resolutions, made by elected officials annually at reorganization meetings across the state, to establish this high interest rate, seemingly oblivious to the dire and pernicious fiscal consequences which will befall the very constituents whom the elected officials seek to serve.

Third Circuit held for the claimants, refusing to find that use of the statutory interest rate constituted a penalty.

In Till, "[t]he Court was asked to determine which of four approaches best equated with the 'present value' requirement of 11 U.S.C. § 1325(a)(5)(B)(ii): the coerced loan, the presumptive contract rate, the cost of funds or the formula approach." In re Flores, 2006 WL 4452973, at *3.

> In choosing the appropriate interest rate, the Court noted that although the Code "entitles the creditor to property whose present value objectively equals or exceeds the value of the collateral, it does not require that the terms of the cram down loan match the terms to which the debtor and creditor agreed prebankruptcy, nor does it require that the cram down terms make the creditor subjectively indifferent between present foreclosure and future payment. . . . The Court rejected the coerced loan, the presumptive contract rate, and the cost of funds approaches, opting for the formula approach because it "entails a straightforward, familiar, and objective inquiry, and minimizes the need for potentially costly additional evidentiary proceedings." [Till, 541 U.S. at 479].

Id. The formula approach "begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a credit-worthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default." Till, 541 U.S. at 478-79. The Court ruled the approach appropriate because "the resulting 'prime-plus' rate of interest depends only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor." Id. at 479.

"The Court recognized that the 'present value' calculation was intended to compensate the creditor for the 'time value of their money and the risk of default,' but not at the expense of the debtor." In re Flores, 2006 WL 4452973, at * 4 (citing Till, 541 U.S. at 477).

17

> The <u>Till</u> Court noted that absent any uncertainty about the debtor's ability to "complete his plan, the prime rate would be adequate to compensate any secured creditors forced to accept cram down loans." [<u>Till</u>, 541 U.S. at 479 n.18]. Where there is some risk that the debtor will be unable to pay, the court should factor in a percentage to reflect the relative risk of nonpayment. While the risk adjustment is flexible, "other courts have generally approved adjustments of 1% to 3%." <u>Id.</u> at 480.

<u>Id.</u>

In <u>Flores</u>, the Court was asked to determine whether <u>Till</u> mandated that creditors apply the formula approach to establish present value of their claims. <u>Id.</u> at *1. In that case, the City of Camden sought to apply the 18% statutory interest rate to its claim rather than following the formula approach of <u>Till</u>, arguing that <u>Till</u> was a nonbinding plurality decision. <u>Id.</u> The Court rejected the City's argument, finding that <u>Till</u> "articulated a clear legal standard establishing the interest rate to be used to determine the present value of a claim[.]" <u>Id.</u> at *1.

In doing so, it noted that, after <u>Till</u>, "most courts addressing the question of present value have applied the prime plus formula approach." <u>Id.</u> at *5. However, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" <u>Marks v. United States</u>, 430 U.S. 188, 193 (1977) (quoting <u>Gregg v. Georgia</u>, 428 U.S. 153, 169 n.15 (1976)). The Court acknowledged that, "[i]n <u>Till</u>, we are able to deduce a 'legal standard.'" <u>In re Flores</u>, 2006 WL 4452973, at *7.

> The plurality opinion concluded that the appropriate standard was the prime rate plus a risk factor. Justice Thomas concurred in the judgment, but disagreed that there should be an adjustment for risk. The dissent favored using the contract rate with a risk factor. Thus, we have five justices favoring the prime rate, four justices preferring the contract rate, and eight justices concluding that the base rate should be adjusted for the risk of default. <u>See</u> Thomas J. Yerbich, "How do You Count the Votes-or Did Till Tilt the Game?", 23 Am. Bankr. Inst. J. 10 (2004). The legal standard for calculating present value in the context of section

18

       1325(a)(5)(B)(ii) is ascertainable.  The legal standard is the prime rate plus a risk factor.

Id.  Thus, the Court concluded that Till effectively overruled the Third Circuit decision in Rankin.  Id. at *5.

       For the reasons expressed by the Court in Flores, this Court finds that the Till formula approach governs the calculation of the interest rate to be applied to Plymouth Park's claim.  Pursuant to Till, that calculation will be made at the hearing on confirmation of Debtor's Plan.

### G.  Whether Plymouth Park violated N.J.S.A. 54:5-63.1

       Lastly, Debtor argues that Plymouth Park must forfeit its tax sale certificate *in toto* for knowingly seeking to collect excessive and unlawful charges and fees from the Debtor in violation of N.J.S.A. 54:5-63.1.  Specifically, Debtor alleges that Plymouth Park inappropriately included in its proof of claim: (1) the $600,100 premium paid for the tax sale certificate, (2) a right to interest on the claim from the date of filing at 18%, and (3) various other unsubstantiated or impermissible amounts.  Pursuant to N.J.S.A. 54:5-63.1:

> Any holder of a tax sale certificate . . . who *knowingly charges or exacts any fee or charge* in connection with the redemption of any tax sale certificate owned by him, in excess of the amounts permitted by chapter five of Title 54 of the Revised Statutes, shall forfeit such tax sale certificate . . . .

(Emphasis added).  In addition:

> [C]ollection of any excessive charge or fee in connection with the redemption or assignment of a tax sale certificate shall be deemed prima facie evidence of the fact that such tax sale certificate holder did knowingly charge and exact such excessive fee or charge within the intent of this act.

Id.

       The record before the Court does not support the conclusion that Plymouth Park knowingly charged or exacted a fee or charge from Debtor in excess of the amounts permitted

19

under New Jersey law.[11]  In fact, when the Court instructed it to do so, Plymouth Park filed an amended proof of claim removing the $600,100 premium.  Moreover, Plymouth Park's response to Debtor's concerns over the calculation errors was reasonable and prompt, such that Debtor avoided any substantial prejudice or harm.  As such, Plymouth Park has not forfeited its claim.

## V.    CONCLUSION

For the foregoing reasons, the Court grants the Debtor's motion for partial summary judgment, finding that Plymouth Park does not hold a "tax claim" under § 511(a).  Rather, Plymouth Park has a lien securing the obligation by the Debtor to pay the redemption amount.  As such, in accordance with <u>Till</u>, the Court will calculate a reasonable interest rate to be charged on the lien at the confirmation hearing.  Debtor is directed to submit a form of order.

Dated:  February 17, 2010

_____
Honorable Michael B. Kaplan
United States Bankruptcy Judge

---

[11] Indeed, whether Plymouth Park knowingly charged fees and costs not permitted under the Tax Sale Law cannot be determined on this record and certainly not by summary judgment.  The Debtor is at liberty to pursue further discovery on this issue and seek reconsideration under 11 U.S.C. § 502(j); however, the Debtor and counsel should be cognizant that the Court will not regard favorably or approve compensation for quixotic endeavors that have no basis in fact or law.