**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW JERSEY

-------------------------------------------------------X

In re:

PRINCETON OFFICE PARK, L.P.,                                    Chapter 11

Reorganized Debtor.                                            Case No.: 08-27149 (MBK)

-------------------------------------------------------X

**MEMORANDUM DECISION**

**APPEARANCES:**

Morris S. Bauer, Esq.
Norris, McLaughlin & Marcus, P.A.
721 Route 202-206
P.O. Box 5933
Bridgewater, NJ 08807-5933

     -and-

Lawrence S. Berger, Esq.
Berger & Bornstein, P.A.
237 South Street
P.O. Box 2049
Morristown, NJ 07962-2049
*Co-Counsel for Princeton Office Park, L.P.*

Stephen B. McNally, Esq.
McNally & Associates, L.L.C.
93 Main Street, Suite 201
Newtown, NJ 07860
*Counsel for Plymouth Park Tax Services, LLC*

**MICHAEL B. KAPLAN, U.S.B.J.**

**I.      INTRODUCTION**

     As more fully detailed below, this contested matter comes before the Court upon

Princeton Office Park, L.P.'s ("Reorganized Debtor") request for reconsideration of Plymouth

Park Tax Services, LLC's ("Plymouth") allowed claim, which claim relates to Plymouth's

purchase of a tax sale certificate on property owned by the Reorganized Debtor. In short, the Reorganized Debtor seeks (i) disallowance of Plymouth's claim based upon provisions in New Jersey's Tax Sale Law and, more specifically, forfeiture of the tax sale certificate by Plymouth pursuant to N.J.S.A. 54:5-63.1, and (ii) to void Plymouth's lien pursuant to 11 U.S.C. § 506(d).

The Court conducted a lengthy trial on this matter, during which time eight witnesses were presented by the parties.[1]  After careful consideration of the evidence and arguments adduced at trial, and upon review of the submissions of the parties, which include post-trial submissions, the Court will sustain the objection of the Reorganized Debtor to Plymouth's claim. The Court finds that Plymouth knowingly charged the Reorganized Debtor improper amounts, by way of Plymouth's proofs of claim, in contravention of N.J.S.A. 54:5-63.1.  Accordingly, the tax sale certificate held by Plymouth is subject to forfeiture, and its lien on the Reorganized Debtor's property is void pursuant to 11 U.S.C. § 506(d).

## II.    JURISDICTION AND VENUE

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended October 17, 2013, referring all bankruptcy cases to the bankruptcy court.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B).  Venue is proper in this Court pursuant to 28 U.S.C. § 1408.  The statutory predicates for the relief sought herein are

---

[1] The Court conducted a trial on this matter on the following dates: October 15th, October 30th, November 7th, November 13th, and November 21st of 2013.  Post-trial summations were presented to the Court on December 6, 2013, and the parties submitted proposed findings of fact and conclusions of law on December 31, 2013. Additionally, on January 9, 2014, the Reorganized Debtor submitted a limited response to Plymouth's proposed findings of fact and conclusions of law.

11 U.S.C. §§ 502(j) and 558, and N.J.S.A. 54:5-63.1.  Pursuant to Fed. R. Bankr. P. 7052, the

Court issues the following findings of fact and conclusions of law.[2]

## III.    FINDINGS OF FACT[3]

### A.    Procedural History and Background

1.  The Reorganized Debtor is a New Jersey limited partnership whose primary asset is a vacant industrial building complex located at 4100 Quakerbridge Road in Lawrence Township, Mercer County, New Jersey ("Property").

2.  Plymouth is a company which was formed for the purpose of investing in tax sale certificates in the State of New Jersey, as well as other states.

3.  The Reorganized Debtor filed a petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on September 9, 2008 (the "Petition Date").

4.  Prior to the Petition Date, on December 19, 2005, Plymouth attended a Lawrence Township, New Jersey sale of municipal tax liens and bid to acquire a tax sale certificate (hereinafter, the "Certificate") from Lawrence Township representing unpaid municipal taxes due with respect to the Property for the period from December 31, 2004 and prior.

5.  At the sale, Plymouth bid the amount of $204,396.79 to acquire the Certificate, bidding a 0% interest rate for redemption, and in addition paid a premium in the amount of $600,100 to Lawrence Township.[4]

6.  Following the sale, Plymouth periodically and consistently paid real property taxes accruing for periods subsequent to 2004 and through the Petition Date against the Property, which amounts once remitted to Lawrence Township were incorporated into the obligation due pursuant to the Certificate.

---

[2] Although this matter is not an adversary proceeding within the scope of Fed. R. Bankr. P. 7001, Fed. R. Bankr. P. 9014, which addresses contested matters not otherwise governed by the Bankruptcy Rules, incorporates Fed. R. Bankr. P. 7052. See Advisory Committee Notes to Fed. Bankr. R. 9014 ("Whenever there is an actual dispute, other than an adversary proceeding, before the bankruptcy court, the litigation to resolve that dispute is a contested matter.").

[3] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

[4] A more detailed discussion on the purchase of tax sale certificates is set forth in Section IV(A) below.

7. Pursuant to N.J.S.A. 54:5-33, Lawrence Township was obligated to return the premium to Plymouth if the Certificate was redeemed within five years, after which time the premium was due to be surrendered to Lawrence Township.

8. As permitted under N.J.S.A. 54:5-86, on December 18, 2007, Plymouth filed a foreclosure complaint seeking, <u>inter alia</u>, to bar the Reorganized Debtor's equity of redemption.  An Order Setting Time, Place and Amount of Redemption was entered by the Superior Court on June 6, 2008, which provided that a Final Judgment could be requested on July 19, 2008. This deadline was extended by consent to September 10, 2008.

9. The Reorganized Debtor's Chapter 11 filing on September 9, 2008 was precipitated by its inability to satisfy the Plymouth tax obligation in full by the redemption date.

10. Shortly after the Petition Date, on October 29, 2008, Plymouth filed a Proof of Claim (the "First POC") in the amount of $1,775,791.33.

11. Faced with the jeopardy of losing the premium paid by Plymouth to Lawrence Township under N.J.S.A. 54:5-33 if redemption of the certificate was not made within five years from the date of sale, Plymouth initiated a motion for relief from stay in the Bankruptcy Court on April 27, 2009, seeking permission to complete the tax foreclosure of the Property.

12. That motion was denied by the Order Vacating Automatic Stay entered on July 15, 2009 (the "July 15, 2009 Order").

13. The July 15, 2009 Order nonetheless protected Plymouth by tolling the five year escheatment period under N.J.S.A. 54:5-33 "during the period that the bankruptcy is in effect, which should be until [December 1, 2014] or by further application to the court."

14. The July 15, 2009 Order further required that the First POC of Plymouth be amended to remove the premium.

15. Finally, the July 15, 2009 Order provided that the amended proof of claim be "paid through the debtor's plan for complete satisfaction of its tax lien certificate(s)," and that the Township of Lawrence shall return the $600,100 premium to Plymouth "upon receipt by the Township of Lawrence of the Plymouth tax sale certificate(s) endorsed for cancellation."

16. As instructed in the July 15, 2009 Order, on January 28, 2010, Plymouth filed its amended proof of claim (the "Amended POC" and, collectively

4

with the First POC, the "Proofs of Claim"), removing the $600,100 premium from the claim.

17. The Amended POC also reduced a 2005 Year End Penalty ("YEP").[5]

18. In the First POC, the 2005 YEP principal amount was $24,073.53 and the interest thereon was $11,651.59.

19. In the Amended POC, the 2005 YEP principal amount was changed to $11,386.24 and the interest thereon concomitantly reduced.

20. Legal fees and costs were reduced from $2,205 to $1,215 in the Amended POC.

21. The $1,215 included attorneys' fees at $500, filing and service of process fees, and title search fees in connection with the foreclosure action on the subject property.

22. The total amount due as of the Petition Date was reduced in the Amended POC to $1,155,487.81.

23. Both Proofs of Claim filed by Plymouth in this matter include:

(i)   the initial Certificate purchase amount of $204,396.79;

(ii)  the series of subsequent tax payments from [December 29, 2005] through [May 20, 2008] in the aggregate principal amount of $677,701.84;[6]

---

[5] New Jersey Tax Sale Law authorizes a municipality to enact a penalty to be charged to a taxpayer with more than $10,000 in unpaid real estate taxes, which enacted penalty cannot be greater than 6% and is calculated on the amount of the unpaid taxes as of the end of the fiscal year ("Year End Penalty").  If the tax sale certificate holder pays the taxes to the municipality prior to the end of the year, the holder is entitled to receive the Year End Penalty as part of the amount required to redeem such certificate of sale.  See N.J.S.A. 54:4-67.

[6] The Court notes that Plymouth's Proofs of Claim characterize subsequent tax amounts as tax "purchases." More accurately, it is the initial tax sale certificate that is purchased, thus allowing the holder to make tax "payments" on subsequent taxes due to the municipality by the property owner.  See, infra, Varsolona v. Breen Capital Servs. Corp., 180 N.J. 605, 618-619 (2004) ("After the requisite time has passed, the tax collector can sell the tax liens at auction…[and] *the purchaser* acquires the lien, with the title,…and receives a certificate of sale…."  [In order to collect certain fees and expenses, including fees and expenses associated with subsequent taxes,] "'*payment* [must be] made to the collecting officer and . . . the holder of the tax title [must] have made and filed with such collecting officer affidavits showing the amount or amounts of such expenses actually disbursed or incurred[.]'") (emphasis added).

       (iii)   the 6% flat penalty of $12,263.81 imposed on the initial purchase amount pursuant to N.J.S.A. 54:5-61;[7]

       (iv)   the 6% Year End Penalty (YEP) imposed on the subsequent tax payments made by Plymouth Park in 2005, 2006 and 2007 pursuant to N.J.S.A. 54:4-67;

       (v)   legal fees and costs; and

       (vi)   interest on the subsequent tax payments and the YEP at the rate of 18%.

24. On September 8, 2009, the Reorganized Debtor filed its Second Modified Chapter 11 Plan and Second Modified Disclosure Statement.

25. The Second Modified Chapter 11 Plan proposed the reduction of the interest rate on the obligation of the Reorganized Debtor to Plymouth to 6%.

26. On February 17, 2010, this Court issued an Opinion which granted the Reorganized Debtor's request for interest rate modification in the Second Modified Chapter 11 Plan.

27. As a result of the Opinion, as well as limited negotiations between the parties, the Reorganized Debtor proposed certain revisions to the Second Modified Chapter 11 Plan. The Court thereafter entered an Order Confirming Second Amended Plan of Reorganization as Modified Herein on May 10, 2010 ("Confirmation Order").

28. The Confirmation Order recited the modifications to the Second Modified Chapter 11 Plan, and further incorporated the determinations set forth by the Court in the Opinion.[8]

29. Throughout the process of confirmation of the Second Modified Chapter 11 Plan, the Reorganized Debtor maintained its intention to prosecute an objection to the allowance of Plymouth's Proofs of Claim under N.J.S.A. 54:5-63.1. In its first consideration of this issue, the Court held, in footnote 11, p. 20 of the Court's Opinion of February 17, 2010:

---

[7] New Jersey Tax Sale Law authorizes a certificate holder to charge the property owner at redemption an additional fee if the certificate amount exceeds $200, in the amount of 2% of the amount paid for the certificate, or, if that certificate amount exceeds $5,000, in the amount of 4% of the amount paid for the certificate, or, if that certificate amount exceeds $10,000, in the amount of 6% of the amount paid for the certificate.  See  N.J.S.A. 54:5-61.

[8] On May 10, 2010, at the request of Plymouth, the Court granted an Order Staying Confirmation Order Pending Appeal (the "Stay Pending Appeal").  Since the entry of the Confirmation Order and the Stay Pending Appeal, the parties have actively litigated an appeal of the interest rate issue addressed in the Confirmation Order.  The appeal is presently on referral from the Third Circuit Court of Appeals to the Supreme Court of New Jersey.

> The record before the Court does not support the conclusion that Plymouth Park knowingly charged or exacted a fee or charge from Debtor in excess of the amounts permitted under New Jersey law. [footnote omitted] In fact, when the Court instructed it to do so, Plymouth Park filed an amended proof of claim removing the $600,100 premium. Moreover, Plymouth Park's response to Debtor's concerns over the calculation errors was reasonable and prompt, such that Debtor avoided any substantial prejudice or harm. As such, Plymouth Park has not forfeited its claim.

30. This holding was subsumed into the Court's Confirmation Order.

31. The Court nonetheless preserved the Reorganized Debtor's right to "pursue discovery and seek reconsideration under 11 U.S.C. §502(j)" of its determination to allow Plymouth's Amended POC. This determination was also stated in footnote 11, p. 20 of the Court's February 17, 2010 Opinion.

32. On September 10, 2010, the Reorganized Debtor filed a motion for reconsideration which initiated this contested matter and set the context for trial. Ultimately, the Reorganized Debtor seeks reconsideration of this Court's determination to allow Plymouth's Proofs of Claim.

33. On July 31, 2013, Plymouth filed a motion to dismiss the Reorganized Debtor's claim objection (or alternatively for summary judgment). For the reasons expressed on the record (and in this Memorandum Decision), the Court determined that the underlying issues surrounding Plymouth's claim should be flushed out at trial, and denied Plymouth's motion. On that basis, the Court continued with trial on the above referenced dates.

**B.    Witnesses**

34. During the course of trial, the Court heard testimony from: (1) Douglas Badaszewski; (2) Diane Ilacqua; (3) Micah Kroloff, Esq.; (4) Michael Pellegrino, Esq.; (5) James Purcell; (6) Eric Elwin, Esq.; (7) Al Fiorello; and (8) Deborah Feldstein, Esq.

35. Douglas Badaszewski is a manager and officer of Plymouth. He has been in a senior managerial and decision making position with the company since he was hired in 1998. Mr. Badaszewski has been in the business of investing in tax sale certificates for 15 years and throughout his employment by Plymouth has been familiar with the New Jersey laws governing tax sale certificates. Further, Mr. Badaszewski was involved with the development and implementation of the computer system for

Plymouth's tax certificate investment business and has continued to be involved with that system's upgrades and modifications over the years.

36. Diane Ilaqua was an employee of Plymouth from 1999 to 2012.  Ms. Ilaqua's job was to complete and file proofs of claims for bankruptcies in New Jersey and elsewhere.

37. Micah Kroloff was hired by Plymouth as an Associate General Counsel in 2005 and has continued to be employed in that position through trial.  Mr. Kroloff is an attorney who is admitted to the bar of New Jersey. Mr. Kroloff's duties at Plymouth involve providing legal services for Plymouth, including as a primary responsibility overseeing bankruptcy matters.

38. Eric Elwin is employed by Plymouth as an officer and General Counsel. Mr. Elwin is an attorney who is admitted to the bar of New Jersey. Mr. Elwin began his employment with Plymouth in 2000 and has continued to be so employed through the time of trial.  Mr. Elwin was hired by Plymouth as its in-house counsel to provide advice on financing, financing agreements and securitizations, and to provide oversight for bankruptcy and foreclosure matters.

39. Albert Fiorello is an assistant vice president of Plymouth.  He was hired in 1998. Mr. Fiorello was initially hired as a funding manager and was subsequently given servicing responsibilities.

40. James Purcell was the chief financial officer and controller of Plymouth. He had been in a senior managerial and decision making position with the company since he was hired in 1998 through his departure from the company in 2010.

41. Michael Pellegrino is an attorney who is admitted to the bar of New Jersey.  Mr. Pellegrino is in the private practice of law and is a member of the firm of Pellegrino & Feldstein with offices in Denville, New Jersey. Mr. Pellegrino's practice specializes in the field of tax sale certificates. Mr. Pellegrino has written a law review article on the subject of tax sales certificates in New Jersey and has written a book on the subject entitled "Tax Liens, The Complete Guide to Investing in New Jersey Tax Liens," a copy of which was entered into evidence.

42. Mr. Pellegrino has represented Plymouth since the company's inception, furnishing Plymouth with legal advice in connection with Plymouth's business of investing in tax sale certificate in New Jersey and representing Plymouth in litigation foreclosing tax sale certificates.

43. Deborah Feldstein is an attorney who is admitted to the bar of New Jersey. Ms. Feldstein is in the private practice of law and is a member of the firm of Pellegrino & Feldstein with offices in Denville, New Jersey.  Ms. Feldstein's practice specializes in the field of tax sale certificates and bankruptcy. Ms. Feldstein has represented Plymouth in New Jersey, after becoming associated with Mr. Pellegrino in 1997, in foreclosures of tax sale certificates and in bankruptcy matters.

## C.    Witness Credibility

The Court has assessed the credibility of the trial witnesses. In terms of witness demeanor (such as body language, eye contact, manner of speech, completeness of answers, and other subtleties), the Court finds Mr. Badaszewski, Mr. Purcell, Ms. Ilacqua, Mr. Fiorello, Mr. Pellegrino, and Ms. Feldstein to be particularly credible and consistent.  By contrast, Mr. Kroloff and Mr. Elwin were often vague and calculating in their responses, and surprisingly unfamiliar with several key aspects of Plymouth's business.   Indeed, the Court is taken aback by Mr. Elwin's professed lack of personal knowledge regarding Plymouth's policies and procedures relative to issues in this case.   Notwithstanding his position as Plymouth's General Counsel, his "I know nothing" mantra throughout his testimony far surpassed the feigned ignorance of Sergeant Schultz.[9]  This Court, thus, questions both the care and accuracy of Messrs. Kroloff's and Elwin's testimony.

## IV.    CONCLUSIONS OF LAW

### A.    Tax Sale Certificates

In New Jersey, a municipality, in order to collect unpaid taxes owed on a property, may sell a tax sale certificate for the amount of the taxes and interest which are in arrears. Varsolona v. Breen Capital Servs. Corp., 180 N.J. 605, 616-18 (2004).  The sale of tax sale certificates are

---

[9] With apologies to the late John Banner, who was best known for his role as Master Sergeant Hans Georg Schultz in the television series *"Hogan's Heroes"* (1965-1971) ("I know nothing! I see nothing! I hear nothing!").

conducted by an auction.  Id.  The amount which a bidder pays for a certificate is fixed at the amount of taxes and interest outstanding.  Id.

At an auction of a tax sale certificate, the bidders bid against each other in the form of the rate of interest which a bidder is willing to accept on the certificate, with the winning bid being the lowest interest rate any bidder will accept.  Varsolona, 180 N.J. at 618; see also N.J.S.A. 54:5-19, 31, 32.  If the interest rate is bid down to 0%, bidders may then bid sums of money or "premiums" that they are willing to pay in excess of the unpaid taxes.  See N.J.S.A. 54:5-32.  In auctions involving premiums, the winning bid is the bid with the highest premium any bidder is willing to pay to the municipality.  See N.J.S.A. 54:5-32.

At the conclusion of the auction, the winning bidder pays the tax collector the amount of the outstanding taxes and interest in consideration of buying the certificate.  If there is a premium associated with the bid, the winning bidder also pays to the tax collector the amount of the premium, which the tax collector holds in escrow.  See N.J.S.A. 54:5-32.  If the certificate is redeemed within five years of the sale, the escrowed premium is returned to the tax sale certificate purchaser.  See N.J.S.A. 54:5-33. After the end of the five year period, if the certificate has not been redeemed, the premium becomes the property of the municipality and is released from escrow. See N.J.S.A. 54:5-33.

**B.      Reconsideration Standard**

Section 502(j) of the Bankruptcy Code establishes that "[a] claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case." Peshkopia v. Katz (In re Kara Homes, Inc.), 2010 U.S. Dist. LEXIS 61411 (D.N.J. June 21, 2010); 11 U.S.C. § 502(j).  As previously noted, a bankruptcy court maintains broad discretion when determining whether to reconsider claims:

§ 502(j) is supplemented by Federal Rule of Bankruptcy Procedure 3008, which states: "A party in interest may move for reconsideration of an order allowing or disallowing a claim against the estate. The court after a hearing on notice shall enter an appropriate order." FED. R. BANKR. P. 3008. The phrase "for cause," as it is used in § 502(j), is not specifically defined in either the Bankruptcy Code or the Rules, "but is an adaptable standard reflecting bankruptcy laws' roots in equity jurisprudence." See Advisory Committee's Notes to FED. R.BANKR. P. 3008. Thus, the bankruptcy court possesses broad discretion in determining whether adequate cause exists for the reconsideration of claims. See In re South Florida Telecommunications, Inc., 234 B.R. 137, 141 (Bankr.M.D.Fla.1998); In re Lomas Financial Corp., 212 B.R. 46, 52. (Bankr.D.Del.1997).

In re Bernardes, 267 B.R. 690, 693 (Bankr. D.N.J. 2001).

Moreover, although "cause" is not expressly defined in the Bankruptcy Code, "courts have substantial discretion in deciding what constitutes 'cause' when deciding whether to grant a motion for reconsideration under § 502(j)," and generally concur that Fed. R. Civ. P. 60(b) helps define "cause" under that section.  Warren v. PNC Bank, Inc. (In re Warren), 499 B.R. 914, 919 (Bankr. S.D. Ga. 2013) (citations omitted); see also In re Compass Marine Corp., 1992 Bankr. LEXIS 1680 (Bankr. E.D. Pa. Oct. 28, 1992) ("[S]ome 'cause' for reconsideration, invoking at least one of the grounds set forth in F.R.Civ.P. 59 or 60(b), must be articulated if [Fed. R. Bankr. P.] 3008 to be successfully invoked.") (citations omitted).  Fed. R. Civ. P. 60(b), incorporated by Fed. R. Bankr. P. 9024, states as follows:

Rule 60.  Relief from a Judgment or Order

 (b)    Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1)    mistake, inadvertence, surprise, or excusable neglect;

(2)    newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3)    fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4)   the judgment is void;

(5)   the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6)   any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

In light of the above, it is clear that this Court has the authority to reconsider Plymouth's Proofs of Claim.  The record has been significantly developed from the time the Court issued its February 17, 2010 Opinion through the dates of trial, and new evidence has been introduced in the form of documentary evidence and witness testimony.  In this regard, the Court is satisfied that equity dictates reconsideration of Plymouth's Proofs of Claim and finds that there is sufficient "cause" to reexamine such claims.

## C.       Burden of Proof

As noted above, 11 U.S.C. § 502 of the Bankruptcy Code governs the allowance of claims or interests in a bankruptcy case.  See 11 U.S.C. § 502.  Further, Fed. R. Bankr. P. 3001(f) provides that "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f); see also In re Allegheny Int'l, Inc., 954 F.2d 167, 173 (3d Cir. Pa. 1992) ("Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is 'prima facie' valid").  During the normal course of claims reconciliation, the validity of such claims may be rebutted by a debtor, at which point the burden shifts to the claimant to prove the validity of the claim by a preponderance of the evidence.  See In re Alessi, 2012 Bankr. LEXIS 1405 (Bankr. D.N.J. Mar. 28, 2012).  In Alessi, this Court described the impact of 11 U.S.C. § 502 as follows:

> When a creditor's proof of claim does not comport with Rule 3001, the claim is "still allowed under [§] 502 of the Bankruptcy code[,] unless the [d]ebtor establishes an exception under [§] 502(b)." In re Dove-Nation, 318 B.R. 147 at 151-152 (B.A.P. 8th Cir. 2004) (citing 11 U.S.C. §§ 502(a) and (b)); see also Am. Express Bank, FSB v. Askenaizer (In re Plourde), 418 B.R. 495, 502-503 (B.A.P. 1st Cir. 2009) ("Section 502(a) provides that a proof of claim filed under § 501 is deemed allowed unless a party in interest (often the trustee) objects. However, even where a party in interest objects, the court "shall allow" the claim unless one of nine exceptions enumerated in § 502(b) applies."); In re Moreno, 341 B.R. at 817 ("the Bankruptcy Code, in particular, § 502(b), sets out the exclusive exceptions for disallowance of a claim[ ]"); In re Guidry, 321 B.R. 712, 714 (Bankr. N.D. Ill. 2005) ("under § 502(b), if a party objects, the court, after notice and a hearing, must allow the claim except to the extent that it is subject to one or more of nine grounds for disallowance enumerated in § 502(b)."). Thus, claims are to be disallowed only if they fall within one of the enumerated exceptions in § 502 (b). In re Moreno, 341 B.R. 813 at 817 (Bankr. S.D. Fl. 2006).

In re Alessi, 2012 Bankr. LEXIS 1405, 5-6 (Bankr. D.N.J. Mar. 28, 2012).

As described above, 11 U.S.C. § 502(b) recognizes certain circumstances in which claims may be disallowed.  To be sure, 11 U.S.C. § 502(b)(1), which contemplates application of non-bankruptcy law, provides, in relevant part, as follows:

> (b) . . . if [an] objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

>> (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement *or applicable law* for a reason other than because such claim is contingent or unmatured . . .

11 U.S.C. § 502(b)(1) (emphasis added).  In addition, 11 U.S.C. § 558 makes certain that:

> The estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statutes of limitation, statutes of frauds, usury, *and other personal defenses* . . . .

11 U.S.C. § 558 (emphasis added).

Thus, based upon the interplay between 11 U.S.C. §§ 502(b)(1) and 558, as well as Fed. R. Bankr. P. 3001,  the Court finds that the Reorganized Debtor may raise New Jersey Tax Sale

Law – more specifically, forfeiture of the tax sale certificate for violation of N.J.S.A. 54:5-63.1 – as an affirmative defense to Plymouth's Proofs of Claim. See In re Cadillac Wildwood Development Corp., 138 B.R. 854 (Bankr. W.D. Mich 1992) (Acknowledging that usury may be used as a defense in reconsideration of an allowed or disallowed claim if permitted by applicable law, but precluding such use under Michigan law); In re Cutler Owens International Ltd., 55 B.R. 291, 203 (Bankr. S.D.N.Y. 1985) (Permitting debtor to utilize New York's closing-door statute as an affirmative defense pursuant to 11 U.S.C. § 558, and denying creditor's motion for summary judgment on its claim).

The burden of persuasion in this case is dictated by N.J.S.A. 54:5-63.1 and is placed upon the Reorganized Debtor.  See Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 26 (U.S. 2000) ("[I]n the absence of modification expressed in the Bankruptcy Code the burden of proof on a tax claim in bankruptcy remains where the substantive tax law puts it.").  While several provisions of New Jersey's Tax Sale Law provide for specific burdens of proof as to certain tax issues, N.J.S.A. 54:5-63.1 is silent on the standard to be applied.[10] In the absence of a specific burden of proof, the Court will apply the "preponderance of the evidence" standard, as that standard is applicable in the majority of civil cases in New Jersey. Saks v. Ng, 383 N.J. Super. 76, 890 A.2d 983 (App Div. 2006); citing Fiore v. Fiore, 49 N.J.Super. 219, 139 A.2d 414 (App.Div.1958); certif. denied 28 N.J. 59, 145 A.2d 168 (1958).  Indeed, the parties do not dispute the appropriateness of such standard in this case.  Moreover, the courts of New Jersey have recognized "that the burden of proof can vary depending upon the type of proceedings, the

---

[10] See, e.g., N.J.S.A. 54:3-26: Hearing, determination of appeals (…"and if said judgment is a final judgment not further appealed, the burden of proof shall be on the taxing district to establish that the assessor acted reasonably in increasing the assessment."); N.J.S.A. 54:10A-5.13: Entitlement to credit established by taxpayer ("The burden of proof shall be on a taxpayer to establish by clear and convincing evidence that the taxpayer is entitled to the credit allowed pursuant to this act."); N.J.S.A. 54:10A-5.20(d): Maintenance of records ("The burden of proof shall be on a taxpayer to establish by a preponderance of the evidence that the taxpayer is entitled to the credit allowed pursuant to this act.").

comparative interests of the parties, the relative litigational strengths or weaknesses of the parties, the access of the parties to proof, and the objectives to be served by the evidence in the contest of the particular proceeding." Romano v. Kimmelman, 96 N.J. 66, 89 (1984). Accordingly, as it is the Reorganized Debtor who seeks relief under N.J.S.A. 54:5-63.1, it is the Reorganized Debtor who carries the burden of persuasion to demonstrate by a preponderance of the evidence that Plymouth should forfeit its tax sale certificate.

### D.      New Jersey Forfeiture Statute -- N.J.S.A. 54:5-63.1

In holding that the Reorganized Debtor may raise N.J.S.A. 54:5-63.1 as an affirmative defense to Plymouth's Proofs of Claim, the Court now turns to that provision.  N.J.S.A. 54:5-63.1 states as follows:

> *Any holder of a tax sale certificate*, excepting any municipal corporation, his agent, servant, employee or representative, *who knowingly charges or exacts any fee or charge in connection with the redemption of any tax sale certificate owned by him, in excess of the amounts permitted* by chapter five of Title 54 of the Revised Statutes, *shall forfeit such tax sale certificate to the person who was charged such excessive or unlawful fee* and the person paying such unlawful charge shall become vested with all the right, title and interest of such tax sale certificate holder in and to such tax lien. In addition thereto the person aggrieved shall have a right of action to recover back the full amount paid by him to such tax lien holder, by an action at law in any court of competent jurisdiction.
>
> The collection of any excessive charge or fee in connection with the redemption or assignment of a tax sale certificate shall be deemed prima facie evidence of the fact that such tax sale certificate holder did knowingly charge and exact such excessive fee or charge within the intent of this act.

N.J.S.A. 54:5-63.1 (emphasis added).  In light of the foregoing, the fundamental issues to be decided in this case, in determining whether forfeiture is warranted, is whether Plymouth, in filing its Proofs of Claim,[11] (i) knowingly charged the Reorganized Debtor (ii) excessive and improper amounts, (iii) in connection with redemption of its tax sale certificate.

---

[11] The Court will primarily focus on the appropriateness of including the premium in Plymouth's First POC which, if improper, would undercut the validity of Plymouth's Amended POC.

**(i)      Redemption**

Plymouth argues that because redemption is a regulated and orchestrated process under New Jersey Tax Law, administered now through the offices of the municipal tax collector, the only way the Reorganized Debtor could redeem the Certificate is by adhering to that process. Consequently, because the Reorganized Debtor has made no effort or attempt at redemption through the offices of the municipal tax collector, and no redemption statement has ever been issued to the Reorganized Debtor by any municipal tax collector, Plymouth argues that it could not have violated N.J.S.A. 54:5-63.1 in that its Proofs of Claim were not filed *in connection with redemption* of the Certificate as required by the forfeiture statute.   As a result, Plymouth maintains that the Certificate should not be forfeited.

Although Plymouth correctly suggests that redemption is generally effectuated through the office of the municipal tax collector, the Court notes that N.J.S.A. 54:5-54.1 was amended in 2009 (effective January 18, 2010), prior to entry of the Confirmation Order on May 10, 2010, to permit redemption in bankruptcy cases:

> § 54:5-54.1. Redemptions through tax collector's office; exceptions
>
> All redemptions shall be made through the tax collector's office, unless authorized by court order **or pursuant to federal bankruptcy law**. Any lienholder who knowingly causes a redemption to be made outside a tax collector's office in violation of this section shall forfeit the tax sale certificate to the redeeming party.

N.J.S.A. 54:5-54.1 (emphasis added).   Thus, where, as here, the Reorganized Debtor is attempting to redeem the Certificate under a confirmed Chapter 11 plan, which is inextricably intertwined with the claims allowance procedures under the Bankruptcy Code and rules, the Court is satisfied that Plymouth's filing of its Proofs of Claim was undertaken *in connection with redemption* as required by the forfeiture statute. See <u>Green Goblin, Inc. v. Simons (In re Green Goblin Inc.)</u>, 2013 Bankr. LEXIS 574 (Bankr. E.D. Pa. Feb. 13, 2013) ("The purpose of a proof

of claim 'is to alert the court, trustee, and other creditors, as well as the debtor, to claims against

the estate,'…and to 'permit the creditor to participate in the distribution . . . of the estate…'")

(citations omitted).

### (ii)    Knowingly Charged

The Court is likewise unpersuaded by Plymouth's assertion that it did not knowingly

charge an excessive and improper premium when filing the First POC.  Although "knowingly" is

not defined by New Jersey Tax Sale Law, the term is commonly used in criminal and other penal

statutes.  For example, N.J.S.A. 2C:2-2 states, in pertinent part, as follows:

> § 2C:2-2. General requirements of culpability
>
> (2) Knowingly. A person acts knowingly with respect to the nature of his conduct
> or the attendant circumstances if he is ***aware that his conduct is of that nature, or
> that such circumstances exist, or he is aware of a high probability of their
> existence***. A person acts knowingly with respect to a result of his conduct if he is
> aware that it is practically certain that his conduct will cause such a result.
> "Knowing," "with knowledge" or equivalent terms have the same meaning.

N.J.S.A. 2C:2-2(b)(2) (emphasis added).  Furthermore, the United States Supreme Court recently

sought guidance from penal laws in fixing the parameters of the term "knowledge."  Pertinently,

the Supreme Court held, in connection with 11 U.S.C. § 523(a)(4) of the Bankruptcy Code

(which excepts from discharge certain debts including those obtained through fraud or

defalcation), that defalcation  includes a "culpable state of mind requirement" described as "one

involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant

fiduciary behavior."  Bullock v. BankChampaign, N.A., 133 U.S. 1754, 1757 (2013).  The

United States Supreme Court expounded that:

> Where actual knowledge of wrongdoing is lacking, we consider conduct as
> equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a
> substantial and unjustifiable risk" that his conduct will turn out to violate a
> fiduciary duty. ALI, Model Penal Code §2.02(2)(c), p. 226 (1985). See id., §2.02

Comment 9, at 248 (explaining that the Model Penal Code's *definition of "knowledge" was designed to include "'willful blindness'"* [sic]).

Bullock v. BankChampaign, N.A., 133 U.S. 1754, 1759-1760 (U.S. 2013) (emphasis added). Thus, guided by the above, the Court must determine whether Plymouth was aware or willfully blind to the fact that its act of including the premium in its First POC was improper and inconsistent with New Jersey's forfeiture statute.

In deciphering Plymouth's knowledge surrounding the inclusion of a premium in its First POC, the Court looks to the testimony of certain Plymouth employees who, at all relevant times, held an agency relationship with Plymouth.  See Mulheron v. Phila. Eagles, 2013 U.S. Dist. LEXIS 7699 (D.N.J. Jan. 18, 2013) ("The Restatement (Third) Of Agency § 1.01 (2006) defines 'elements of agency' as 'posit[ing] a consensual relationship in which one person, to one degree or another or respect or another, acts as a representative of or otherwise acts on behalf of another person with power to affect the legal rights and duties of the other person.' Some examples of when an agency relationship arises are "employer and employee, corporation and officer, client and lawyer, and partnership and general partner.") (citations omitted).  In further analyzing the "knowingly" prong of N.J.S.A. 54:5-63.1, the Court also utilizes the imputation doctrine, as appropriate.  As the New Jersey Supreme Court observed:

> The imputation doctrine is derived from common law rules of agency relating to the legal relationship among principals, agents, and third parties. Pursuant to those common law rules, a principal is deemed to know facts that are known to its agent. Restatement (Third) of Agency § 5.03 (Tentative Draft No. 6, 2005) ("[N]otice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of that fact is material to the agent's duties to the principal."). Courts have used interchangeable terms to express this legal rule with some describing the principal as "imputed" with the agent's knowledge, Hercules Powder Co. v. Nieratko, 113 N.J.L. 195, 199, 173 A. 606 (Ch.Ct.1934), and others stating that the principal has "constructive knowledge," Hollingsworth v. Lederer, 125 N.J. Eq. 193, 206, 4 A.2d 291 (E. & A.1939) (per curiam), or "constructive notice," Integrity, supra, 240 N.J. Super. 480, 506, 573 A.2d 928, of the agent's knowledge. See also post (using terms interchangeably). Regardless of

the terminology, the purpose of the doctrine is the same--to protect innocent third parties with whom an agent deals on the principal's behalf. See Nischne v. Firestone Tire & Rubber Co., 116 N.J. Eq. 305, 308, 173 A. 341 (Ch.Ct.1934) ("The rule of implied notice is invocable to protect the innocent, never to promote an injustice."). Principals thereby are prevented "from obtaining benefits through their agents while avoiding the consequences of agent misdeeds." Andrew J. Morris, Clarifying the Imputation Doctrine: Charging Audit Clients with Responsibility for Unauthorized Audit Interference, 2001 Colum. Bus. L. Rev. 339, 350 (2001).

NCP Litig. Trust v. KPMG LLP, 187 N.J. 353, 366-367 (N.J. 2006). Thus, if the Reorganized Debtor adequately demonstrates that Plymouth's agents knowingly charged the Reorganized Debtor excessive and improper amounts, then Plymouth may be imputed with the knowledge of those agents (in this case, Plymouth's employees). In that regard, the Court finds that the Reorganized Debtor has sustained its burden.

The Court finds, based primarily on witness testimony, that Plymouth knowingly charged excessive amounts in Plymouth's First POC, which included an excessive and improper premium. In so doing, that knowledge is directly attributable to Plymouth by means of the imputation doctrine. In support of the Court's legal conclusion that Plymouth knowingly charged the Reorganized Debtor excessive amounts, the Court makes the following factual findings regarding witness testimony:

### Mr. Badaszewski

44. The knowledge of Mr. Badaszewski, as an officer and member of senior management of Plymouth from the firm's inception in 1998 to date, is attributable to Plymouth.

45. Mr. Badaszewski was experienced in tax sale certificate investments and familiar with New Jersey's Tax Sale Law, and knew that the law strictly prescribed what could be charged to the property owner in connection with redemption of a tax sale certificate.

46. Mr. Badaszewski, since the beginning of his employment as an officer and high ranking member of Plymouth's management, knew that the property owner against whose property the tax sale certificate was issued was "never

obligated" for or responsible to pay the tax certificate holder for any premium which the certificate holder might have paid to acquire the tax sale certificate.

47. Even though Mr. Badaszewski knew that the property owner who filed for bankruptcy was never obligated to pay the premium to the certificate holder, and that the obligation for the refund of the premium, if it was returnable, was solely that of the municipality, the policy and procedures that Mr. Badaszewski and the other senior management of Plymouth set up at Plymouth for preparing and filing proofs of claim specifically directed that the proofs of claim include any premiums as a claim of Plymouth against the Reorganized Debtor and its estate.

48. Mr. Badaszewski understood that including the premium in the proof of claim caused the Reorganized Debtor to pay the premium to Plymouth through the plan payments, and, therefore, was not simply a "placeholder" to bring that issue to the Court's attention.

49. Despite acknowledging that the inclusion of a premium in a proof of claim in the context of a tax sale certificate was improper, Mr. Badaszewski made no effort to change Plymouth's policy of including such premium and, at a minimum, was willfully blind to Plymouth's improper policy.[12]

## **Mr. Kroloff**

50. The knowledge of Mr. Kroloff, as associate general counsel of Plymouth having within the sphere of his responsibilities and duties the oversight of bankruptcies and proofs of claim of Plymouth filed in those bankruptcies and therefore a proper corporate agent, from 2005 to date, is attributable to Plymouth.

51. Mr. Kroloff knew, soon after starting employment at Plymouth, that the property owner against whose property the tax sale certificate was issued was not obligated for or responsible to pay the tax certificate holder for any premium which the certificate holder might have paid to acquire the tax sale certificate.

52. Mr. Kroloff acknowledged that it was the "general wisdom within Plymouth that in no event is the property owner obligated to pay the premium to [Plymouth]."

53. Even though Mr. Kroloff knew that the property owner who filed for bankruptcy was never obligated to pay the premium to the certificate holder,

---

[12] According to Plymouth, the company changed its practice in or about late 2008 or 2009, after the Petition Date, and ceased including the premium in proofs of claim filed in New Jersey.  The Court notes, however, that it reaches its conclusion notwithstanding Plymouth's policy change, and merely acknowledges such change for completeness of the record.

and that the obligation for the refund of the premium, if it was returnable, was solely that of the municipality, the policy and procedures that Mr. Kroloff and the other senior management of Plymouth set up at Plymouth for preparing and filing proofs of claim specifically directed that the proofs of claim include any premiums as a claim of Plymouth against the Reorganized Debtor and its estate.

54. Despite acknowledging that the inclusion of a premium in a proof of claim in the context of a tax sale certificate was improper, Mr. Kroloff made no effort to change Plymouth's policy of including such premium and, at a minimum, was willfully blind to Plymouth's improper policy.

## Mr. Elwin

55. The knowledge of Mr. Elwin, as general counsel and an officer of Plymouth having within the sphere of his responsibilities and duties the oversight of legal issues, including, but not limited to, selection of and interaction with outside legal counsel, tax sale certificate foreclosures in New Jersey and elsewhere and bankruptcies and proofs of claim of Plymouth filed in those bankruptcies and therefore a proper corporate agent, from 2000 to date, is attributable to Plymouth.

56. Mr. Elwin knew, soon after starting employment at Plymouth, that the property owner against whose property the tax sale certificate was issued was not obligated for or responsible to pay the tax certificate holder for any premium which the certificate holder might have paid to acquire the tax sale certificate.

57. From the early days of the company, Plymouth set a policy of including the premium paid to a municipality for the purchase of a tax sale certificate in Plymouth's proof of claim filed in the bankruptcy of a debtor who owned real estate subject to that certificate.

58. Despite acknowledging that the inclusion of a premium in a proof of claim in the context of a tax sale certificate was improper, Mr. Elwin made no effort to change Plymouth's policy of including such premium and, at a minimum, was willfully blind to Plymouth's improper policy.

59. In an e-mail exchange between Mr. Elwin and Ms. Ilacqua, dated January 5, 2007, Ms. Ilacqua noted that Plymouth's outside counsel, Ms. Feldstein, objected to the Reorganized Debtor's plan on Plymouth's behalf, and that the Reorganized Debtor indicated that it intended to object to Plymouth's First POC. Ms. Ilacqua also noted that the Reorganized Debtor was requesting a breakdown for payments made and, in particular, more information regarding inclusion of a premium in Plymouth's First POC. In response to Ms. Ilacqua's e-mail regarding such information, Mr. Elwin replied "Let's get [Ms.

Feldstein] what she needs: ***If they object to the premium, we'll probably have to give up on that***." <u>See</u> Trial Exhibit P-54 (emphasis added).[13]

## Mr. Purcell

60. The knowledge of Mr. Purcell, who was an officer and member of senior management of Plymouth from the firm's inception in 1998 to 2010 and therefore a proper corporate agent for all time relevant to this case, is attributable to Plymouth.

61. At some time soon after Mr. Elwin joined Plymouth as its general counsel, Mr. Purcell, in connection with working on the Excel spreadsheet formula for use in completing proofs of claim, asked Mr. Elwin to contact Michael Pellegrino, Plymouth's outside counsel on tax certificate foreclosures and bankruptcy matters, and ask him if it was appropriate to include the premium paid for a certificate in the proof of claim.

62. Although Mr. Purcell asserts that Mr. Elwin reported back to him that Mr. Elwin had spoken to Mr. Pellegrino and confirmed that it was proper to include the premium in the proof of claim, Mr. Pellegrino's and Ms. Feldstein's testimony (both of whom maintain that it is not proper to include a premium in a proof of claim) directly contradicts Mr. Purcell's testimony.

## Mr. Fiorello

63. The knowledge of Mr. Fiorello, as an officer and member of senior management of Plymouth from the firm's inception in 1998 to date and therefore a proper corporate agent, is attributable to Plymouth.

64. From the early days of the company, Plymouth set a policy of including the premium paid to a municipality for the purchase of a tax sale certificate in Plymouth's proof of claim filed in the bankruptcy of a debtor who owned real estate subject to that certificate.

65. Despite knowing that the inclusion of a premium in a proof of claim in the context of a tax sale certificate was improper, Mr. Fiorello made no effort to change Plymouth's policy of including such premium and, at a minimum, was willfully blind to Plymouth's improper policy.

---

[13] Little more than this Exhibit is needed by way of evidence to persuade this Court that Plymouth knowingly opted to include premiums in its proofs of claim as a business decision, notwithstanding the utter lack of factual, legal or moral support for this policy.

**Ms. Ilaqua**

66. The filers of Plymouth's proofs of claim were instructed by Plymouth, from the beginning of Plymouth's business, to insert into the proofs of claim the total amount which Plymouth showed as its investment, including any premiums paid to the municipality in order to purchase the certificate and any attorneys' fees and other expenses incurred.

67. Prior to the bankruptcy court's electronic filing system, the procedure at Plymouth for filing proofs of claim was for Ms. Ilacqua and other preparers to submit the prepared proofs of claim to Mr. Badaszewski, who would review the proofs of claim, sign them, if approved, and then return them to the clerks, who would file them with the bankruptcy courts.

68. Upon the advent of the bankruptcy court's electronic filing system, Mr. Badaszewski set up a filing account in his name with the bankruptcy court. Ms. Ilacqua and other persons at Plymouth would then prepare the proofs of claim as they had previously done, but rather than preparing a paper document, they prepared the proofs of claim electronically **without Mr. Badaszewski's review**, affixed Mr. Badaszewski's electronic signature, and filed under Mr. Badaszewski's filing account.[14]

In light of the above findings of fact with respect to witness testimony, the Court finds that the Reorganized Debtor has proven, by a preponderance of the evidence, that Plymouth knowingly charged an improper and excessive premium in Plymouth's First POC – to wit, a $600,100 premium in which the Reorganized Debtor was not and could not be obligated to pay.

(iii)    **Excessive amounts**

Liability under New Jersey's forfeiture statute also requires that Plymouth charge or exact excessive amounts permitted by chapter five of Title 54. With respect to the Reorganized Debtor's contention that Plymouth charged an excessive amount by including the $600,100 premium in its First POC, it is undisputed that such premium was included in Plymouth's initial claim. Indeed, Plymouth has acknowledged filing proofs of claim in this and other New Jersey bankruptcy cases that included a premium, from the inception of Plymouth in 1997 through late

---

[14] Another unlawful and irresponsible practice which the Court is confident has been discontinued.

2008 or 2009.  As previously noted, Mr. Badaszewski, Mr. Kroloff, Mr. Fiorello, and Mr. Elwin testified that Plymouth's procedures for filing proofs of claim specifically directed that the proofs of claim include any premiums as a claim of Plymouth against a debtor and its estate, and Ms. Ilaqua testified that filers of the proofs of claim were instructed by Plymouth to include any such premiums.  More importantly, it is undisputed that a property owner would never be responsible to make payments, on account of a premium, to a tax certificate holder, and therefore Plymouth's First POC seeks to recover *excessive amounts* from the Reorganized Debtor. Accordingly, the Court finds that the Reorganized Debtor has satisfied the requirements of N.J.S.A. 54:5-63.1.

The Reorganized Debtor further contends that Plymouth charged excessive amounts by including in its Proofs of Claim excessive legal fees, and improper interest accruals on penalties.[15]  While the Court agrees that Plymouth improperly charged excessive amounts by including a premium in its First POC, thereby satisfying the "excessive amount" prong of N.J.S.A. 54:5-63.1, the Court holds a contrary view with respect to legal fees.  Specifically, the Court disagrees with the Reorganized Debtor's characterization that certain legal fees and costs charged by Plymouth were excessive.  Instead, the Court agrees with Plymouth's rational that N.J.S.A. 54:5-63.1 refers to amounts "in excess of the amounts permitted by chapter five of Title 54," which does not include legal fees and costs.  Rather, claims for legal fees and costs are available to parties under Title 22 or the New Jersey Court Rules.  Thus, the Court will not apply

---

[15] Although the Amended POC removed the premium and reduced the amount of penalties and interest sought, the Reorganized Debtor continues to object to Plymouth's legal fees as excessive with respect to the Amended POC.

N.J.S.A. 54:5-63.1 with respect to the legal fees and costs charged in Plymouth's Proofs of Claim.[16]

### E.   Other Issues Advanced at Trial

#### (i)   Proofs of Claim as a "Placeholder"

Although Plymouth maintains that its practice of including premiums in proofs of claim was for the purpose of protecting the premium by bringing the "at-risk" premium to the attention of the bankruptcy court as a "placeholder," the Court cannot ignore the fact that an excessive amount, in the form of a premium, was in fact charged against the Reorganized Debtor in Plymouth's First POC.  As set forth above, witness testimony confirms this fact.  Moreover, the Bankruptcy Code provides sufficient means for Plymouth to alert the Court to issues regarding the premium.  Indeed, Plymouth often files, and in this case did file, a stay relief motion seeking permission to complete the tax foreclosure of the subject Property so that it would not jeopardize the premium.  In this regard, the Court disagrees with Plymouth's position.

#### (ii)   Advice of Counsel

Although Mr. Purcell's testimony indicates that Mr. Elwin confirmed through outside counsel, Mr. Pellegrino, that including a premium in a proof of claim was appropriate, Mr. Pellegrino's and Ms. Feldstein's testimony directly contradicts Mr. Purcell's testimony.  Instead, Mr. Pellegrino and Ms. Feldstein, both of whom the Court finds to be credible witnesses, explained their respective positions on premiums as follows:

---

[16] While the Court believes that there is sufficient evidence to demonstrate that Plymouth also charged excessive interest amounts and/or accruals, the Court need not delve into detail on those fees in light of its finding that the premium amount, in and of itself, was excessive.

### Mr. Pellegrino

69. Mr. Pellegrino testified that it was his legal position from at least the time Plymouth entered the tax certificate business through the date he testified at trial, that it would not be proper to include the premium in the proof of claim, as a debtor has no liability for the premium, nor any obligation to return it. He further testified that had he been asked that question by Plymouth at any time, he would have told Plymouth that it is not proper to include the premium in the proof of claim.

### Ms. Feldstein

70. Ms. Feldstein testified that, in early 2000, she recalled being on a conference call with Mr. Pellegrino and Plymouth management relative to a discussion on filing proofs of claim.

71. During the conference call, Ms. Feldstein heard Plymouth ask if Plymouth could include as part of Plymouth's claim in a proof of claim, the amount of any premium paid in connection with the purchase of a certificate. Ms. Feldstein heard Mr. Pellegrino answer by stating that the premium is not an obligation owed to Plymouth by the property owner and cannot be included in a proof of claim in a bankruptcy proceeding. She testified that was also her legal position as well at the time, and it has always remained her legal position.

As previously noted, the Court has assessed the credibility of the witnesses, finding Mr. Pellegrino's and Ms. Feldstein's testimony to be highly credible. Although some key factual differences are, as is natural, a function of differing perceptions, use of language, and recall, Mr. Pellegrino's and Ms. Feldstein's steadfast legal opinion and testimony as to the inappropriateness of including a premium in a proof of claim is convincing. As such, the Court finds that Plymouth's reliance on the advice of outside counsel as justification for including the premium in its First POC is misplaced.

### (iii)    Plymouth's Refund Policy

Likewise, Plymouth cannot rely on its policy to refund wrongfully collected monies from debtors as validation for including the premium in its First POC. The evidence before the Court reinforces that Plymouth's "refund policy" ignores the potential harm to innocent parties and

hardly remedies the damages to the bankruptcy process.  Plymouth acknowledges that refunds were only forwarded to bankruptcy trustees or debtors upon redemption of the certificates.  Until such redemption, Plymouth continued to collect payments under plans which included amounts for the premiums paid.  Plymouth offered no response to inquiries by the Court as to how this practice mitigated the harm to debtors who had cases dismissed where they were unable to pay the inflated claims, or even opted against pursuing confirmation of a bankruptcy plan in light of the added charges.  The Court cannot help but spotlight Plymouth's brazen practice to refund improperly collected amounts, ***without interest***, at the same time it often collected nearly 30% annual returns on its investment.

Plymouth's policy does not alter the fact that a premium was knowingly charged to the Reorganized Debtor when it was included in Plymouth's First POC.  Additionally, it is undisputed by the parties that in no scenario would a property owner be obligated to pay a premium to the tax sale certificate holder, as any payments by the property owner are paid through the municipality, which in turn may refund the premium where appropriate.  Although Plymouth's refund policy is an attempt to rectify the improper collection of monies from debtors, such policy is directly at odds with N.J.S.A. 54:5-63.1 and the Bankruptcy Code.[17]

## V.    CONCLUSION

In light of the foregoing, the Court: (i) grants the Reorganized Debtor's request for reconsideration of the allowance of Plymouths Proofs of Claim; and (ii) finds that Plymouth violated N.J.S.A. 54:5-63.1, subjecting Plymouth's Certificate to forfeiture to the Reorganized Debtor.  Plymouth's claim is thus disallowed in its entirety and, as a result, the underlying lien is

---

[17] Needless to say, if the Court is unpersuaded by Plymouth's policy to *return* wrongfully collected funds to debtors on account of premiums, the Court is likewise unpersuaded by any argument that justifies including a premium in a proof of claim merely because doing so was an established policy of Plymouth.  To the contrary, Plymouth could have, and indeed should have, reexamined its "auto-pilot" policy prior to the Petition Date, particularly in light of the Court's findings regarding Plymouth's knowledge and the knowledge of its agents.

void pursuant to the operation of 11 U.S.C. § 506(d).  The Reorganized Debtor is directed to

submit a form of order consistent with the Court's findings.

Honorable Michael B. Kaplan
United States Bankruptcy Judge

Dated: January 31, 2014